In re ESTATE OF BENJAMIN G. KAPLAN, Deceased.—(BERTHA W. KAPLAN, Indiv. and as Co-Ex'rx of the Estate of Benjamin G. Kaplan, *et al.*, Petitioners-Appellees and Cross-Appellants, *v.* M. S. KAPLAN COMPANY, Respondent-Appellant and Cross-Appellee.)

First District (3rd Division)   No. 62335

Opinion filed December 13, 1978.—Rehearing denied February 2, 1979.

Chapman & Cutler, of Chicago (John B. Huck and Abbey Blattberg, of counsel), for appellant.

Philip R. Toomin, Michael P. Toomin, Wachowski & Wachowski, and Mayer, Brown & Platt, all of Chicago, for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

This action centers upon the construction of certain provisions of a stock alienation agreement (hereafter referred to as the "agreement") entered into between M.S. Kaplan Company (hereafter referred to as "MSK") and Benjamin G. Kaplan (hereafter referred to as the "decedent") on August 5, 1966. The agreement provided that upon the decedent's death, his estate was obligated to sell, and MSK was obliged to purchase, decedent's shares of stock at their book value as of the end of the month immediately preceding his death. MSK's accounts determined that decedent's stock was worth, at the time of his death, $9,181,504. MSK has paid this amount to decedent's estate. Petitioners were dissatisfied with that determination and instituted this suit. The trial court ordered MSK to pay petitioners an additional $1,052,414.82. MSK appeals and petitioners cross-appeal, both sides contending that the court erred with respect to several accounting issues. Petitioners also allege error in the trial court's treatment of their claim for statutory penalties under section 45 of the Business Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 157.45).

Respondent MSK is a family-owned corporation engaged in the scrap metal business. Petitioners are Bertha Kaplan, decedent's widow and co-executor of his estate, and her two children. Continental Illinois National Bank and Trust Company of Chicago (hereafter referred to as "Continental") is co-executor of the decedent's estate.

The crucial provision of the agreement in question is paragraph 5.12 which provides in pertinent part:

"For the purpose of determining the purchase price * * *, book value * * * shall be determined by the certified public accountants regularly employed by the Company. In determining the book value, the certified public accountants shall apply the same principles, practices and procedures used in the preparation of the Company's year-end statements of operations, after:

A. Eliminating goodwill and other items not in dispute;

B. Creating a reserve for bad debts or increasing the existing reserve so as to equal the amount customarily set up in the past;

C. Adjusting the value of the inventories shown on the last yearly audit report of the company by the increase or decrease therefrom reflected in the books of the company as of the date on which book value is determined;

D. Making provision for all federal, state and local taxes for

the period immediately preceding the month in which the death occurred."

The decedent died on November 21, 1969. At the time, he owned 6,076 shares or approximately 51% of MSK's stock. Pursuant to the agreement, Ernest Newton, and the firm of Laventhol, Krekstein, Horwath & Horwath (hereafter referred to as "LKH&H"), MSK's regularly employed accountants, determined that the book value of decedent's stock as of October 31, 1969, was $1,511.11 per share. In accordance with that determination, MSK paid the aforementioned $9,181,504 to decedent's estate.

Petitioners brought the present action seeking a construction of the agreement and also to set aside the determination of the book value of decedent's shares in MSK. Petitioners further requested that they be granted access to MSK's books and records.

After examining MSK's books and records pursuant to court order, petitioners filed an amended petition alleging that the accountants' valuation report did not constitute a determination of book value as required by the agreement and further, that the report was so permeated by fraud, error or gross mistake as to render it not binding on the parties. Petitioners sought to set aside, or in the alternative to increase, the determination of book value. Petitioners also requested the allowance of section 45 penalties on the basis of MSK's refusal to grant access to its records.

In response, MSK contended that, in the absence of proof of fraud or gross mistake, the valuation report was binding upon the parties and was not subject to redetermination by the trial court. MSK further maintained that petitioners, as decedent's legal representatives, were estopped to challenge the accounting principles and procedures employed by Newton in preparing the valuation report since the decedent, during his lifetime, had been responsible for the formulation and approval of both MSK's accounting methods and the agreement in question. MSK also argued that since decedent had accepted and retained the benefits of buy-outs involving other shareholders' estates, his estate was equitably estopped to repudiate or alter the valuation provisions of the agreement in a manner inconsistent with past transactions. After a lengthy hearing and discussion of several accounting issues raised by both sides, the court entered judgment for petitioners in the aforementioned amount.

We first consider MSK's contention that the accountants' determination of the book value of decedent's shares was binding and consequently not subject to redetermination by the trial court.

Petitioners maintain that the valuation report did not in fact constitute a determination of book value as required by the agreement. They rely upon a letter accompanying the report which stated:

"[T]he scope of our examination did not provide for direct confirmation of receivables nor did it include the observation of inventories at October 31, 1969.

Because the receivables and inventories at October 31, 1969 enter materially into the determination of the company's financial position we do not express an opinion on the accompanying balance sheet taken as a whole."

Petitioners state this disclaimer indicates that the accountants in effect made no finding in connection with the financial statements they had examined.

In the alternative, petitioners contend that if the report did constitute a determination of book value, it was so permeated by fraud, error and gross mistake as to have no binding effect upon the estate. Specifically, petitioners allege that the accountants failed to verify figures given them by MSK management relative to materials shipped by MSK to complete certain overseas sales. In the valuation report the sum of $1,980,964 was reflected as accounts payable to merchandise creditors. An investigation of MSK's books revealed no invoices for these transactions and that, in fact, the materials had been withdrawn from MSK's own inventory or bailment inventory. Petitioners maintain that the accountants' failure to verify these figures or to advise petitioners that they had not been verified constituted gross negligence.

Petitioners also allege that the accountants utilized a method for setting up a bad debt reserve which was neither in accordance with MSK's past practices nor with the provisions of the agreement. The valuation report contained a bad debt reserve for amounts advanced to a wholly owned subsidiary of MSK, California Auto Reclamation Company (hereafter referred to as "CARCO"), in the amount of $1,310,000. A similar reserve was set up for $73,027 advanced to Prolerized St. Louis Corporation (hereafter referred to as "PROLERIZED"), an auto hulk shredding business created by MSK and another corporation. Petitioners contend that the bad debt reserve customarily set up in the past to cover all items of this nature was $225,000 and that any reserve in excess of that amount was unauthorized. Petitioners further claim the valuation report was in conflict with MSK's past practices and with the terms of the agreement.

In its written opinion, the trial court did not discuss petitioners' allegations of fraud and gross mistake. Rather, the court held it was free to correct the valuation report because the agreement did not provide the accountants' determination of book value was to be conclusive upon the parties. The court reasoned that the essential element of the agreement was a binding contract to sell and to purchase at book value. The requirement that the accountants determine book value was not a

submission of this issue to the accountants' sole discretion, but rather, was simply a means of fulfilling the contract. The court also noted that the agreement specifically provided for recourse to the courts in the event of any controversy concerning the right or obligation to purchase or sell any stock. The court held that this provision militated against an interpretation of the agreement which would render the accountants' determination of book value final and conclusive.

■■■ While this interpretation of the agreement alone is justification for the trial court's subsequent redetermination of book value, we also believe there was sufficient evidence to warrant a finding of gross negligence or error on the part of Newton and LKH&H. The trial court determined that neither of the bad debt reserves included in the valuation report were authorized by the agreement or the past practices of MSK by which the parties were bound. For reasons which we shall discuss later, we believe this ruling was correct. The original bad debt provision resulted in a reduction of MSK's net worth by $1,383,027 before taxes. This was a substantial mistake. Additionally, although $1,980,964 was initially included in the valuation report as accounts payable, it was later discovered that these accounts were not recorded on MSK's books, nor were there any invoices for these transactions. Newton stated that this figure was given him by Laurence Kaplan, MSK's president and decedent's nephew, and that he had used it in the preparation of the valuation report although it had never been verified. After it was determined that the materials represented by these accounts had been withdrawn in part from MSK's own inventory and in part from its bailment inventory and the accountants had conceded that the accounts payable had been overstated by $812,151, the trial court adjusted the balance sheet to reflect a $512,269 increase in net worth. While we shall discuss these transactions in greater detail, the foregoing details demonstrate that the valuation report contained errors of a substantial nature. On this basis also, it was correct for the court to redetermine the book value of MSK's stock. (See *Bank of California v. First Mortgage Co.* (1972), 6 Wash. App. 718, 495 P.2d 1057; *Aron v. Gillman* (1955), 309 N.Y. 157, 128 N.E.2d 284; *Ultramares Corp. v. Touche* (1931), 255 N.Y. 170, 174 N.E. 441.) Such a holding renders moot MSK's contention that the trial court erred in striking its defenses based on a theory of estoppel. Even if petitioners were estopped to question the practices used in preparing the valuation report, they were not obliged to accept a report which contained errors of a substantial nature.

We next consider the disputed accounting transactions in detail. As a preliminary matter, the trial court determined, and we agree, that both MSK's past practices and the provisions of the agreement required that

MSK's investments in all subsidiaries and affiliated companies be carried at cost. Neither side disputes this finding.

We first consider the issue as to the CARCO reserve. MSK contends that the trial court erred in disallowing the bad debt reserve for amounts advanced to CARCO by MSK. In 1961, decedent directed that CARCO be incorporated as a wholly owned subsidiary of MSK. CARCO was created to purchase autos, at prices bid by MSK officers, from city pounds and to prepare them for conversion into scrap. The scrap was then sold to MSK's 50% owned Prolerized-Chicago Corporation at prices set by the buyer.

The operations of MSK and CARCO were closely integrated. All of CARCO's officers were also executive officers of MSK. CARCO's books and records were maintained by MSK's accountants. The latter also customarily prepared CARCO's operating statements.

MSK initially invested $100,000 in the capital stock of CARCO. This amount was reflected on MSK's books in an account titled "Investments— California Auto Reclamation Co." and on CARCO's books in its capital stock account. This original investment was evidently an undercapitalization since CARCO required substantially more capital to acquire the buildings, improvements, and equipment necessary for its operations. CARCO sustained losses in each year of its operation and MSK periodically advanced CARCO funds needed to pay expenses and to meet payrolls. As of October 31, 1969, these advances totalled $1,310,000. The advances over and above the initial capital investment were carried on MSK's books under the heading "California Auto Reclamation—Loan Account"; CARCO recorded them as an account payable. However, on MSK's balance sheets, the advances were not included in the accounts receivable, but were reflected in an asset account titled "Investments, Advances, Etc." In the valuation report for decedent's stock, the assets for the first time were included in an asset account covering "Investments, loans and advances." CARCO did not issue any capital stock, promissory notes or other documents to MSK with respect to the advances. No dividend or interest was paid by CARCO to MSK and none of the advances were ever repaid.

On June 8, 1970, a meeting was held at the law offices of counsel then representing petitioners. Present were petitioners' counsel, Laurence Kaplan, Bertha Kaplan, Newton, and two Continental trust officers. The group discussed whether the amounts advanced to CARCO by MSK should be written off as a bad debt. The nature of CARCO's operations created an oil seepage problem which was the subject of an official complaint. The estimates for repair ranged from $75,000 to $200,000. Despite CARCO's recurrent losses and the estimated cost of repairs, it

was decided that MSK would cause CARCO to bid on an upcoming city contract. CARCO's bid was unsuccessful and it thereafter ceased operations on December 31, 1970.

Based on the foregoing facts, the trial court concluded that the write-down of $1,310,000 as a bad debt was improper. The court considered whether the amount should properly be considered an additional capital investment or a loan. The court rejected MSK's contention that since its management considered the amounts advanced to CARCO to be a loan, such designation was controlling. The court held, rather, that the substance and not the form of the transaction should determine its proper characterization. The court discussed several factors which indicated that the advances should be treated as an additional capital investment. Among these were the facts that none of the additional advances were evidenced by a note; no interest was charged on MSK's books; repayment was not expected except out of future profits; MSK's claim for collection would be subordinated to the claims of trade creditors and lenders; and the advances were literally throwing good money after bad. The court held this last factor was characteristic not of a lender, but of an investor attempting to salvage its investment.

After determining that the $1,310,000 should be treated as an additional capital investment, the court considered whether any of that amount could be written down to its realizable value. Expert witnesses for both sides testified that if CARCO was not a going concern as of October 31, 1969, or if its demise could then have been reasonably planned, the write-down would have been proper. The court held that such was not the case and that, in fact, at the time of the preparation of the valuation report, Newton understood that CARCO would continue and bid upon the city contract. The court held, therefore, that the reserve could not be justified as a write-down of a bad investment since CARCO was a going concern, and no impairment of capital would at that time be considered permanent. The trial court also cited its prior finding that the agreement and MSK's past practices mandated that investments in all subsidiaries and affiliated companies be carried at cost. The court held that to allow an exception to this uniform cost listing in the case of CARCO, in the form of a write-down of all or a portion of MSK's equity investment to its realizable value, would violate the provisions of the agreement by which the parties agreed to be bound.

■ We believe the trial court correctly found that the $1,310,000 advance to CARCO was an additional capital investment and not a loan. Petitioners have cited cases which consider the issue whether, for tax purposes, a parent company's advances to a wholly owned subsidiary may be characterized as a loan. MSK counters that, when a court is called upon to construe a contract between private parties, the intent of

management in making the advances should control. It argues that the Federal taxation cases are inapplicable because policy considerations in that field mandate a strict scrutiny of this type of transaction in order to detect fraudulent tax evasion.

While we recognize that tax law is a specialized field of limited applicability to other areas of law, we believe the general principles articulated in the cases cited by petitioners are useful in determining the proper accounting treatment of these advances to CARCO. MSK should not be allowed to alter the essential identity of a transaction simply by expressing an intention to treat it as something else. Although management intent is an important factor, it is not the only one, especially where the substance of the transaction does not conform to the expressed intent. (See *Raymond v. United States* (6th Cir. 1975), 511 F.2d 185; *Wood Preserving Corp. v. United States* (4th Cir. 1965), 347 F.2d 117.) A finding of a genuine debtor-creditor relationship between CARCO and MSK would require "more than a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclatural captions." (*Tyler v. Tomlinson* (5th Cir. 1969), 414 F.2d 844, 850.) As is evident from our emphasis of the trial court's findings on this issue, we believe CARCO's method of operation was a blueprint for financial failure from the outset, a result brought about largely by MSK's own actions. CARCO and MSK were, in economic reality, one and the same corporation. We fail to perceive any justification for characterizing the advance as a loan rather than as an additional capital investment. The trial court, having found that the advances were a capital investment, correctly ruled that the uniform cost listing mandated by the agreement prohibited the write-down of all or part of this amount to its realizable value. To allow an exception in the case of CARCO would violate the terms of the agreement by which the parties were bound.

We finally note that even if the advances to CARCO were treated as a loan, they could not be reserved against as separate items of indebtedness. Paragraph 5.12 of the agreement clearly indicates that only one reserve for bad debts was contemplated by the parties to the contract. There is no authority, therefore, for setting up a separate reserve for any amounts owing from CARCO.

We next consider a similar issue involving PROLERIZED. It was a corporation organized in 1966 by MSK and Proler Steel Corporation to carry on an auto hulk shredding business in the St. Louis area. MSK guaranteed a loan to PROLERIZED as part of its agreement with Proler Steel to obtain financing for their joint corporation. PROLERIZED never became operational, but the project was not abandoned until August 1971. As of October 31, 1969, MSK had advanced a total of $73,027

to PROLERIZED which was used to pay off the bank loan. No portion of these advances had been written off in MSK's prior year-end statements of operations. The debt was written off for the valuation report only.

■■ Under these circumstances, the trial court correctly held that the customary bad debt reserve of $225,000 was sufficient to cover this debt and that, therefore, a separate reserve for PROLERIZED was improper. Additionally, the set up of a separate reserve for a particular bad debt was not authorized by paragraph 5.12 of the agreement. Moreover, the agreement provided that MSK's past practices and procedures should govern the preparation of the valuation report. Since the amounts advanced to PROLERIZED had not been written off or specially reserved against in MSK's prior year-end statements of operations, we think it was clearly improper to set up a separate bad debt reserve for PROLERIZED for purposes of the valuation report.

We also must discuss the issue involving the deferred tax benefit reserve. Since CARCO's inception, MSK filed consolidated income tax returns with its wholly owned subsidiaries. MSK's annual tax liability was offset by the amount of CARCO's annual losses. The tax benefit to MSK was not credited to MSK's earnings for that year, but was recorded as a deferred liability in a deferred tax benefit reserve account. The yearly tax benefit was held in that account for a period of five years, after which it was credited to MSK's earnings. This procedure was prompted by an internal revenue service regulation which provides that unused losses may be carried forward five years to offset future gains. The tax benefit to MSK for any one year was thus tentative for a period of five years since CARCO, in the event it became successful, could use its losses to offset gains.

The tax decreases resulting from CARCO's losses aggregated $607,500 for the period from March 31, 1962, through October 31, 1969. MSK added to its earnings as of March 31, 1968, the CARCO tax benefit from the taxable year ending March 31, 1962, in the amount of $10,469. MSK added $105,431 to its earnings as of March 31, 1969, that amount constituting the CARCO tax benefit from the taxable year ending March 31, 1973. As of October 31, 1969, the balance in the deferred tax benefit reserve account was $491,650.

In the valuation report Newton added the entire deferred liability balance of $491,650 to MSK earnings although only the CARCO tax benefit in the amount of $106,321 from the taxable year ending March 31, 1964, was more than five years old. Newton apparently believed the transfer of the entire balance was justified as a set-off to the bad debt reserve in the amount of $1,310,000. The net effect of these transactions on MSK's net worth was a decrease of $818,350.

The trial court noted its previous rulings that the $1,310,000 reserve

was improper and concluded that the transfer of the entire account to MSK's earnings was improper. The court held that since only the 1964 tax benefit of $106,321 was over five years old, only that amount should have been transferred to MSK's earnings.

■■ The trial court's ruling on this issue is supported by MSK's past practices and procedures, which were required to be followed by the agreement. Apparently abandoning any contention that a transfer of the entire balance was justified, MSK argues here that the 1964 tax benefit would not have been transferred to MSK's earnings until March 31, 1970. MSK maintains that the transfer of $106,321 on October 31, 1969, was therefore premature. This argument overlooks the language of the agreement which directs the accountants to "apply the same principles, practices and procedures used in the preparation of the company's year-end statements of operations." Newton prepared the valuation report as if it was a year-end report, treating March 31, through October 31, 1969, as the taxable year. Consistency demands that if other year-end practices are followed, there should likewise be a transfer from the deferred tax benefit reserve account to MSK's earnings. The trial court correctly ordered the transfer of the 1964 tax benefit.

■■ ■ MSK argues that the disallowance of the bad debt deduction of $1,310,000, coupled with the required transfer of $106,321 to MSK's earnings, results in a double benefit to decedent's estate: the estate is not required to bear any portion of the loss resulting from the uncollectibility of MSK's loan to CARCO, but is nevertheless permitted to share in the tax benefit generated by CARCO's losses. MSK's argument fails because, as we have previously held, the advance to CARCO was not a loan, and even if it was, could not have been specially reserved against in the valuation report since the agreement permitted only the customary reserve of $225,000. Consequently, decedent's estate did share in MSK's losses for uncollectible loans, but only to the extent required by the agreement. The argument also fails because the amounts transferred from the tax benefit reserve account depended solely on the expiration of five years and they were never utilized by MSK to offset the amounts advanced to CARCO. Thus, since the valuation report was prepared as if it was a year-end report, decedent's estate was entitled to its pro-rata share of the 1964 tax benefit, regardless of the status of the advances to CARCO.

MSK also challenges the trial court's decision regarding foreign boat sales. In determining MSK's book value as of October 31, 1969, Newton concluded that all foreign boat sales should be included where bills of lading showed acceptance of the goods on board ship by October 31, 1969. The valuation report contained a boat sales profit statement for five Spanish and two Korean boats. The statement included an item labelled

"Accrued material costs not credited to specific vendors" in the amount of $1,980,964. The net profit on the boat sales was calculated at $598,985.

The parties do not dispute the inclusion of the boat sales profits. What is argued is the method of calculating the net profit. The controversy centers around the $1,980,964 account payable to unspecified vendors. With regard to the five Spanish boats, Newton learned after the preparation of the valuation report that the materials shipped on those boats had not been purchased from outside sources but had been withdrawn from MSK's own inventory. Newton thereafter reduced the account payable by $812,151, the amount of the Spanish boat materials. He also reduced the company inventory by $708,028. The difference in the corresponding reductions, $104,123, was required because the cost of materials was now accrued on the basis of MSK's inventory prices which were approximately $5 per ton lower than the market price originally used.

The trial court allowed the reduction of inventory, but computed it to be $696,846, thus resulting in a $115,305 increase in net worth instead of the $104,123 calculated by Newton. MSK does not here dispute this adjustment. As an issue on their cross-appeal, petitioners dispute the allowance of any reduction of inventory for materials shipped on the Spanish boats.

■■ We believe the trial court correctly allowed the inventory reduction. At the time Newton prepared the valuation report, he was told that these materials were not withdrawn from company inventory and he thus accrued the cost of these goods at the prevailing market price. Newton was provided with the unadjusted book inventory which did not reflect that these materials had been withdrawn. Therefore, once it was determined that the materials had in fact been taken from inventory and that the account payable was overstated, it was necessary to correspondingly reduce inventory by the tonnage of the shipment. The testimony on this issue is, at the very least, confusing. The trial court was in a better position to assess the evidence and we believe properly resolved the issue in favor of MSK.

After the reductions for the Spanish boats and for goods accepted after October 31, 1969, a $1,082,997 balance remained in the account payable. This amount represented the cost of materials shipped on the two Korean boats. Newton accrued the cost of these shipments at the then prevailing market price. It was later determined, however, that the materials had not been obtained from outside vendors, but had been withdrawn from MSK's bailment inventory. The issue with respect to these shipments concerns the proper method of accruing the cost of the goods shipped.

MSK contracted with U.S. Steel to receive and process mill rejects at

MSK's Gary yards so that they could be returned to U. S. Steel in sizes suitable for recycling in its melting furnaces. MSK received a service charge for the processing, but the scrap remained the property of U. S. Steel. MSK received several types of scrap, including carbon steel scrap plates called "cobbles." The cobbles were large steel plate pieces which failed to meet U.S. Steel standards in the rolling process. Separate inventories of each type of scrap were kept by weight; each railroad car bringing scrap was weighed on an electronic scale. Records of the balance owed on the bailment account were kept by MSK and by U. S. Steel and were reconciled each month.

In 1967 MSK found there was a market for cobbles in Korea. This type of scrap, selling for $22 per ton in Chicago, would bring $57 per ton in Korea. The shipping cost to Korea was only $10 per ton. MSK adopted a plan whereby 75% of the cobbles received from U. S. Steel were set aside for such shipment over a two year period. The cobbles were loaded onto ships bound for Korea. MSK ultimately returned carbon steel scrap to U. S. Steel which was never informed of MSK's use of cobbles. MSK returned other types of carbon steel scrap which were, for recycling purposes, the same as cobbles.

In 1969, MSK shipped 31,852 tons of cobbles to Korea. Newton accrued the cost of these shipments at $34 per ton, the prevailing market price, for a total of $1,082,997. Nothing concerning the physical taking or replacement of the cobbles was ever reflected upon MSK's official perpetual inventory records or upon the bailment inventories for cobbles. Only an unofficial inventory was kept at the shipping facilities.

MSK contends the use of U. S. Steel's cobbles constituted a borrowing, with a replacement at some future time of comparable materials obtained from outside vendors. MSK purchased amounts of carbon steel scrap equal to the tonnage shipped on the Korean boats. MSK's books and records do not indicate that these materials were in fact used to replace the cobbles owing to U. S. Steel. On the basis of its claim of borrowing, MSK claims that the cost of the goods shipped on the Korean boats should be accrued at the then prevailing market price, $34 per ton.

Petitioners characterize MSK's claim of borrowing as fictitious or, in the alternative, contend that the use of U. S. Steel's cobbles was essentially a criminal act. They maintain that MSK's borrowing claim is contradicted by its perpetual inventory record which reflects that materials loaded on the two Korean boats had been withdrawn from MSK's own inventory. Petitioners argue that to allow MSK to accrue to cost of materials shipped as if they had been withdrawn from U.S. Steel's bailment inventory, in addition to the reduction of inventory shown on the corporate records, results in an unwarranted double costing of these

materials. In the alternative, petitioners contend that MSK appropriated and sold property that it did not own and that such conduct amounted to theft. Since there is no legal obligation to repay stolen property, petitioners urge that MSK should not be allowed to set up any liability for its use of U. S. Steel's cobbles.

The trial court struck a balance between both positions. The court recognized that MSK's use of U. S. Steel's cobbles was, in essence, a misappropriation, but also found that the legality or illegality of these transactions was irrelevant to the determination of the proper method of calculating the profits from the boat sales. The court concluded that the proper basis for computing the cost of goods sold on the Korean boats would be MSK's inventory price for the carbon steel substituted for the cobbles. This result coincided with the entry in the perpetual inventory record which indicated that the amounts shipped on the Korean boats had been withdrawn from MSK's own inventory. After computing the cost of goods on the basis of MSK's inventory price, the court reduced that item by $354,386. Together with the previous corrections relating to the Spanish boats and the transactions not completed as of October 31, 1969, this adjustment resulted in an increase in the boat sales profits, and consequently of MSK's net worth, of $512,269.

■■ We believe the trial court's resolution of this unique issue was entirely equitable and supported by the record. Neither side's position adequately describes what actually took place: a secret taking and sale which was not reflected in any of MSK's official records and was not discovered either by U. S. Steel's or by MSK's accountants. Petitioners cannot rely on MSK's official records to disprove the latter's use of the cobbles because the taking was not reflected on those books and was never intended to be. Simply stated, these transactions cannot be categorized according to traditional accounting practices and procedures. The trial court's cogent determination of this issue resolved, as the court stated, "the impossible situation that the valuation report reveals that the cobbles were sold out of inventory which didn't exist with a fictitious dollar amount payable to U. S. Steel which account payable was never paid." Under the circumstances, we do not perceive how any other result could have been reached, and we agree with the trial court's resolution of the issue.

MSK also contests the trial court's disposition of the Valley Steel interest accrual. MSK from time to time extended loans to a number of its customers, including Valley Steel. Although the loans were interest bearing, MSK followed the practice of not accruing any of the interest due from its customers but instead recorded the interest only when payment was received. The trial court ruled that, for purposes of the valuation report, Newton should have accrued the interest on the Valley Steel loan which resulted in a $15,300 increase in book value.

■■ Although the agreement mandates that MSK's year-end practices and procedures be followed in the preparation of the valuation report, this requirement is predicated upon the assumption that such practices and procedures are not violative of generally accepted accounting principles. The trial court found that this practice of MSK, regardless of the consistency of its application, was violative of those principles and that since the basic aim of the agreement was to channel profit into net worth, the interest on the Valley Steel loan should be accrued for purposes of the valuation report. We agree.

We perceive no rationale, for purposes of computing MSK's net worth, for failing to accrue the interest on this loan while accruing the interest on all other forms of commercial paper. Since this practice is not in accordance with generally accepted accounting principles, the $15,300 increase in MSK's net worth was warranted.

We next consider the issue involving the Cal-Nitro joint venture. Periodically MSK entered into joint ventures with other companies. On April 15, 1969, MSK and H&P Equipment entered into a joint venture agreement for the purpose of dismantling the Calumet Nitrogen Products Company plant in order to sell the scrap iron and steel. The agreement provided that all profits and losses were to be shared equally by the joint venture and that the net profits were to be distributed upon the expiration of the joint venture. The Cal-Nitro joint venture was in operation as of October 31, 1969, and was not completed until the fiscal year ending March 31, 1973.

MSK and H&P each made an initial investment of $109,050 which was used to acquire the venture's inventory. As of October 31, 1969, the sales of the joint venture totalled $306,087 which amount was reflected on MSK's books as a credit on its accounts payable ledger. MSK's payments on behalf of the venture, including the initial investment, amounted to $247,175 which was recorded as a debit on the ledger. Thus, the accounts payable ledger had a credit balance of $58,912 on the valuation date. MSK had made interim payments to H&P totalling $63,461 and this amount was recorded as a debit to H&P on MSK's accounts receivable ledger. From these figures, MSK calculated its net equity in the Cal-Nitro joint venture as $4,549.

In the trial court, MSK contended that its customary practice was to defer recognition of profit or loss on any joint venture until the year the venture was completed. MSK stated that in the interim period during which the venture was operational, it utilized a "recovery of cost" method of accounting whereby material and operating expenses were offset against the sales proceeds on the account payable ledger for the venture. Any excess of sales over expenses would be reflected as a net credit on the account payable until profit or loss was recognized upon completion of

the venture. Therefore, since the Cal-Nitro joint venture was not completed as of October 31, 1969, MSK argued that the net equity which should be included in the valuation report, pursuant to MSK's past practice, was the $4,549 difference between the account payable and the account receivable.

The trial court chose instead to rely upon an income and expense statement for the Cal-Nitro joint venture which showed that as of October 31, 1969, the excess of sales over expenses amounted to $177,355.50. The court noted that every year-end balance sheet from 1961 through 1969 included among MSK's assets, "Joint ventures at equity in underlying net assets." This practice of MSK refuted its contention that recognition of profit on joint ventures was customarily deferred until completion of the venture. It also demonstrated that the $4,549 did not accurately reflect net equity in underlying assets. The court held that since no evidence had been presented as to the value of Cal-Nitro's underlying assets, the measure of MSK's net equity in the venture should be one-half of the excess of sales over expenses, or $88;678.

■■ MSK argues that even if the foregoing determination of the trial court is correct, MSK should be allowed to deduct its initial investment of $109,050 as the cost of salvage materials purchased by the venture. MSK failed, however, to offer any evidence of the relation between the cost of the salvage materials and their equity value. The trial court noted that the investment could have an equity value of five times greater than the original investment or one-half thereof. We believe the court properly refused to speculate on this issue. The only evidence presented as to MSK's net equity in the joint venture consisted of the income and expense statement and expert testimony relating thereto. The trial court correctly held that MSK's net worth should be increased by its proportionate share of the excess of sales over expenses.

We also consider MSK's contention that the trial court erred in increasing MSK's net worth as the result of the Sun Steel inventory. Sun Steel is a division of MSK which purchases new steel coils and sheet metal from steel mills and cuts the material to the specifications of its customers. MSK's prior year-end balance sheets showed that the Sun Steel inventory was valued on a "first-in-first-out" (FIFO) costing method. Under this pricing method it is assumed that the materials first purchased are the ones first sold and the cost of the earliest purchases thus becomes the cost of goods sold for purposes of computing profit or loss. The most recent purchases are assumed to be the ones still on hand so that their cost becomes the value of the remaining inventory carried on the balance sheet.

In the trial court, MSK argued that although the prior year-end

balance sheets showed that Sun Steel's inventory was valued according to the FIFO method, the method actually used was a hybrid system of valuation which was close to the FIFO method but not identical. When asked to explain this hybrid system, Newton stated that he did not know exactly what it meant. In preparing the valuation report, Newton started with an actual inventory of Sun Steel's materials taken August 31, 1969, and averaged the cost of purchases and sales in September and October, 1969. He utilized this method because it would have been difficult, at the time he was preparing the report, to reconstruct the actual physical inventory on hand at Sun Steel as of October 31, 1969.

The trial court held that although the method used by Newton would be acceptable if consistently applied, the prior practice of MSK, as revealed by its year-end balance sheets, was to utilize the FIFO method of pricing. Since MSK's year-end balance sheet customarily valued Sun Steel's inventory on a FIFO basis and since no evidence was introduced as to what the alleged hybrid system of valuation might be, the court concluded that Newton erred in averaging the cost of purchases and sales for September and October, 1969. The court calculated the increase in the value of the Sun Steel inventory resulting from the application of the FIFO method of pricing to be $183,372.

■■ We believe the trial court was correct in holding that, by virtue of the agreement, Sun Steel's inventory should be valued according to the FIFO method of pricing. Newton conceded that there was no difficulty in valuating the inventory on a FIFO basis. MSK's balance sheets showed that this method was customarily used in calculating the value of Sun Steel inventory. Although a hybrid system of pricing may indeed have been used by its accountants, MSK introduced no evidence as to what that system was and Newton could not explain it.

■■ MSK contends in the alternative that even if Sun Steel's inventory should have been valuated on a FIFO basis, the trial court erred in failing to deduct a tax increase of $97,255 attributable to the increased amount. In its judgment order the trial court held that, as a result of its findings, MSK's net worth should be increased by $1,943,495 before taxes. The court further found that the taxes attributable to the increase amounted to $387,088 and thus reduced the increase in net worth to $1,556,407 after taxes. MSK has not directed us to any evidence which would indicate that the allowance for taxes did not include an appropriate amount attributable to the increased value of Sun Steel's inventory. We therefore reject MSK's contention that the $183,372 increase ordered by the trial court should be reduced.

As a principal issue on their cross-appeal, petitioners contend that the trial court erred in not assessing penalties under section 45 of the Business

Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 157.45). This claim for penalties arises out of MSK's failure to respond to Bertha Kaplan's written demand for inspection of its corporate books and records.

■■ ■ A corporation's failure to respond within a reasonable time to a shareholder's written demand for inspection pursuant to section 45 does, under the proper circumstances, constitute a denial of access and thus is a section 45 violation. (See *Rabens v. Jackson Park Hospital Foundation* (1976), 40 Ill. App. 3d 113, 351 N.E.2d 276.) In the present case, however, Bertha Kaplan's demand was not adequate because it lacked the assent of Continental, her co-executor.

Decedent's will provided:

> "Whenever the office of executor or of trustee is served by more than one (1) fiduciary, any action taken or power or right exercised with respect to such office shall require the assent of a majority of the fiduciaries then serving in such office."

Petitioners seek to avoid the obvious intent of this provision by arguing that Continental did not expressly decline to join in Bertha Kaplan's demand, and, therefore, its silence should be construed as implied assent. This contention overlooks Continental's answer to Bertha's original petition to which Continental was made a party respondent. In its answer, Continental stated that it "requested Mrs. Kaplan's attorney to advise it of any facts or legal authority justifying her demand so that it could properly assess the request that Continental join in said demand * * *. No authorities or facts were submitted in response to said request and accordingly, Continental has refused to join in this proceeding and has advised its Co-Executor and her counsel that it does not believe that this proceeding is a proper one to be brought on behalf of the Estate." We are unable to construe this language as anything other than an express denial to join in the demand for inspection. As petitioners point out, Continental did request MSK to permit access to books and records as a matter of courtesy, but it did not join in Bertha's demand for inspection as a matter of right under section 45. MSK could therefore have justifiably believed that it was not required to permit such access since decedent's will required the co-executor's assent to such action.

Petitioners argue that even if it is found that Continental declined to join in the demand, its assent thereto was unnecessary. They reason that the provision requiring the assent of co-executors does not apply where the action taken is an attempt to collect an indebtedness due the estate. Petitioners contend that the restrictive language was intended to apply only to administrative matters involving disbursement of estate funds. We perceive no such limitation in the language used in decedent's will. The provision requires majority assent to any action taken by a co-executor. Bertha was acting in her capacity as a co-executor in making demand for

inspection upon MSK, and by virtue of decedent's will, she was required to obtain Continental's assent before taking such action. Moreover, Continental objected to the action proposed by Bertha on the ground that the costs and expenses involved were not appropriate expenses of the estate. While hindsight might indicate that Bertha's course of action was justified, we nevertheless believe that she was required to obtain Continental's assent to her demand for inspection in order to render it legally adequate under section 45.

For the reasons stated, the judgment of the circuit court of Cook County in favor of petitioner is affirmed. The judgment denying penalties to petitioners under section 45 is also affirmed.

Judgments affirmed.

JIGANTI and McGILLICUDDY, JJ., concur.