**Coles W. RAYMOND, M.D. and Virginia Raymond, his wife, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 74–1575.

United States Court of Appeals, Sixth Circuit.

March 5, 1975.

Michael Avedisian, Avedisian & Avedisian, Andrew H. Avedisian, Paducah, Ky., for plaintiffs-appellants.

George J. Long, U. S. Atty., Louisville, Ky., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Gilbert E. Andrews, Bennet Hollander, Jeffrey Blum, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before EDWARDS, McCREE, and MILLER, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from a directed verdict for the government in a suit brought under 28 U.S.C. § 1346(a)(1)[1] for refund of federal income taxes. The issues require us to decide whether taxpayers were entitled to have the jury consider whether advances made by them to their wholly-owned corporation were loans and not contributions to capital, and, if the advances were loans, whether taxpayers' dominant motivation in extending them was to protect their trade or business.

During the summer of 1965, Dr. Coles W. Raymond, a specialist in obstetrics and gynecology, developed a serious physical disability that forced him to curtail his practice and to seek an alternative source of income. He decided to enter into the automobile dealership business with his wife, Virginia Raymond, who had not been employed during their marriage.

In February 1966, taxpayers filed articles of incorporation for Checker Cars, Inc. of Paducah, Kentucky. At the time

1. Section 1346(a)(1) of Title 28 provides, in relevant part,

The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws
.   .   . .

of incorporation, the total authorized capital stock was six hundred shares. Three hundred shares of common stock were issued to Virginia Raymond and the same number to her husband, for which each paid $3,000. Virginia Raymond was elected President and Treasurer of the corporation, and her husband was elected Vice President and Secretary. The corporation entered into a franchise dealership with Checker Motors Corporation for the sale of new and used Checker cars.

In June 1966, taxpayers filed articles of amendment changing the name of their corporation to Ash Motors, Inc. Shortly thereafter, Virginia Raymond, as President of Ash Motors, entered into a dealership franchise and dealer sales agreement with Nissan Motor Corporation to engage in the sale of new and used Datsun automobiles and trucks, and into a Dodge dealer agreement with Chrysler Motors Corporation to engage in the sale of new and used Dodge automobiles and trucks. As a condition of granting the dealership, Chrysler required that Ash Motors' capitalization be increased by approximately $20,000. The taxpayers made this additional investment.

From 1966 until 1969 when the corporation became insolvent, Virginia Raymond worked six days a week managing its two branches, and Coles Raymond worked about ten hours a week as an assistant manager. They received no salary or wages for their services. During the same period of time, taxpayers made advances to their corporation: $33,490.82 in 1966, $40,702 in 1967, $38,082.62 in 1968, and $2,489.23 in 1969. In addition to these direct advances, taxpayers, as guarantors of certain Ash Motors' debts, paid various amounts to creditors, and leased the facilities necessary for the corporation's operation. In all, they advanced approximately $151,067 for which they were never repaid.

On September 30, 1969, the corporation failed because of Nissan's failure to deliver a new model automobile on time, some labor problems, and the misman-agement of a supervisory employee. By December 31 of the same year, the corporation had a net operating loss of approximately $157,000.

During the next year, taxpayers claimed that the advances made to the corporation were worthless loans. Accordingly, on April 11, 1970, they filed a claim for a refund of $8,218.28. The Commissioner denied the claim on September 16, 1970. On June 7, 1971, taxpayers filed claims for refunds in the amount of $3,301.80 for 1967, $9,357.89 for 1968, $4,704.62 for 1969, and $40,589.67 for 1970. These claims were denied on February 20, 1973.

Taxpayers then filed this action in federal district court for a refund. The complaint alleged that the advances made by them to Ash Motors were loans; that they were made in connection with taxpayers' trade or business; that they were worthless; and that, accordingly, taxpayers were entitled to deduct them in full as bad business debts.

At trial, taxpayers adduced, in support of their contention that the advances were loans and not contributions to capital, only their own testimony that they considered the advances loans, a ledger from the corporation's books that had the notation, "notes payable" to Dr. Raymond totaling approximately $151,000, and two checks totaling approximately $2,000 that stated that they were written as loans from taxpayers to their corporation. Taxpayers conceded, however, that no notes were ever given to evidence the obligations, and that the corporation gave them no unconditional promises to repay the obligations at fixed maturity dates or at fixed interest rates. The evidence also disclosed that no security was given for the advances, and that it was unlikely that an outsider would have made such speculative loans. Moreover, it appeared that the corporation was inadequately capitalized and that some of the advances were used to purchase capital assets. Finally, the proofs showed that taxpayers' advances were subordinate to the claims of outside creditors and that repayment of the ad-

vances was contingent on the success of the enterprise. The only other evidence adduced by taxpayers that arguably supports their claim is the following resolution from the minutes of a meeting of the corporation's Board of Directors which provided:

> Be it further resolved, that said Bank is hereby authorized and directed to honor and pay any checks, drafts, notes or orders so drawn, whether such checks, drafts, notes or orders be payable to the order of any such person signing and/or counter-signing said checks, drafts, notes or orders, or any of such persons in their individual capacities or not and whether such checks, drafts, notes or orders are deposited to *the individual credit of the person* so signing and/or countersigning . . . or to *the individual credit* of any of the other officers or not . . . . [Emphasis added.]

Taxpayers argue that this writing was intended to obviate the necessity of having to issue a promissory note each time a loan was made to the corporation or to someone else in payment of an obligation of the corporation. The government argues that this writing speaks for itself, and that it was intended only as a direction to any financial or banking institution to honor any signature or countersignature of any authorized individual or surety for Ash Motors, Inc.

After taxpayers had completed the presentation of their case, the district court, in considering the government's motion for a directed verdict, stated that it was the court's duty "to ascertain whether or not . . . reasonable minds could differ as to the factual determinations that should be made under the requirements of the law as they govern the standards against which those factual determinations must be measured. . . ." It considered that no notes payable had been given by the corporation, that there was no expressed intention to repay the advances at a time certain and at a fixed rate of inter-

est, and that no security had been given. Only two of the checks, amounting to approximately $2,000, were ever themselves denominated as loans. Moreover, taxpayers testified that they looked for repayment of their advances from *corporate earnings* in contrast to a creditor who looks for repayment from any source—earnings, capital or loans from other creditors. The ledger notation was not sufficient to fill the void of evidence.

In determining whether a reasonable person could conclude that the advances made to the corporation were loans, and not contributions to capital, the district court could properly consider all these factors in addition to the identity of interest between the creditors and the shareholders and the timing of the advances during the corporation's organization. *E. g.* Smith v. Commissioner, 370 F.2d 178, 180 (6th Cir. 1966), Bordo Products Co. v. United States, 476 F.2d 1312, 201 Ct.Cl. 482 (1973), Austin Village, Inc. v. United States, 432 F.2d 741 (6th Cir. 1970), Curry v. United States, 396 F.2d 630 (5th Cir. 1968) cert. denied, 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968), Fin Hay Realty Co. v. United States, 398 F.2d 694 (3d Cir. 1968), Berkowitz v. United States, 411 F.2d 818 (5th Cir. 1969). The district court then concluded that taxpayers' advances to their corporation were contributions to capital and not loans.

Appellants present four issues for our consideration. We believe, however, that the resolution of only one will dispose of this appeal: whether the district court erred in concluding that no reasonable person could find that the advances taxpayers made to their wholly-owned corporation were loans and not capital contributions. Because we hold that the district court did not err in concluding that, as a matter of law, the advances were contributions to capital, we need not consider whether the jury should have been permitted to determine whether the advances, if debts, were business debts or nonbusiness debts.[2]

---

**2.** The district court held, as a matter of law, that taxpayers were not engaged in the trade or business of Ash Motors:

> Nowhere was the definite expression of the actual employment of Dr. and Mrs. Raymond as employees as opposed to their

When a taxpayer makes advances to a corporation which subsequently becomes insolvent, the transactions may be treated in three different ways by the Internal Revenue Code of 1954, depending upon the character of the advances and the dominant motive of the taxpayer in making them. If an advance is a contribution to capital, the amount of the contribution is added to the basis of the stock, Int.Rev.Code of 1954, § 1011, and if it becomes worthless, the shareholder is entitled to a capital loss equal to the basis in the stock. Int. Rev.Code of 1954, § 165(a). If the advance is a genuine debt, the treatment of it when it becomes worthless is governed by section 166 of the Int.Rev.Code of 1954. A loss arising from a nonbusiness bad debt, one not created or acquired in connection with the taxpayer's trade or business, is treated as a short-term capital loss. A business bad debt, one created or acquired in the taxpayer's trade or business, is treated as an ordinary loss and may, accordingly, be deducted in full against ordinary income. In order to show that a loss was created or acquired in connection with his trade or business, a taxpayer must show that he made the loan either to protect his employment or as part of an established business of financing corporations. *E. g.* United States v. Generes, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), Whipple v. Commissioner, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), Townshend v. United States, 384 F.2d 1008, 181 Ct.Cl. 635 (1967), Holtz v. Commissioner, 256 F.2d 865 (9th Cir. 1958).

In order to be deductible as a bad business debt, taxpayers needed first to demonstrate that the advances made to Ash Motors were loans and not contributions to capital. "Only a bona fide debt . . . which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money" qualifies, as a bad debt for the purposes of section 166. Treas.Reg. § 1.166–1(c).

In determining whether a jury could reasonably have considered that taxpayers' advances to their corporation were loans and not contributions to capital, we hold that taxpayers' statement characterizing the transactions as loans, standing alone, is insufficient, as a matter of law. *Cf.* United States v. Generes, *supra.* In that case, the Supreme Court considered whether the dominant motivation of a taxpayer, the president of a closely-held corporation, for undertaking an indemnity obligation to creditors of the corporation, was to protect his $12,000 salary. At trial, taxpayer had testified that his sole motive for agreeing to be an indemnitor was to protect his employment as president. The Supreme Court, in directing a judgment n. o. v. for the Government, considered, *inter alia,* that taxpayer worked less than ten hours each week as president, that he also held a full-time position as president of a savings and loan association at an annual salary of $19,000, and that his annual gross income for the taxable years in question was approximately $40,000. It explained that it had examined the record carefully and that it could find "nothing" that would support a jury determination that taxpayer's dominant motivation was to protect his $12,000 salary. The Court added that the taxpayer's

status as investors. There was no accrual of any salary upon the books; no expression anywhere as to any amount of salaries at some point in time to be paid up to them; no entries of accounts; no issuance of notes of the Corporation in support of the claimed amount of salary, whatever they may have been.

After examining these facts, it concluded "that reasonable minds could not ascribe on this record of evidence a dominant motivation described to the preservation of the trade or business rather than to the protection of a

further profit anticipated from the successful conduct of his automobile business."

Although United States v. Generes, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972) and Whipple v. Commissioner, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963) support the district court's determination that taxpayers' evidence did not create a jury question whether the advances made by them arose out of their trade or business, we do not reach this question because we hold that the district court properly concluded that the advances were contributions to capital.

statements obviously are self-serving. In addition, standing alone, they do not bear the light of analysis. What the taxpayer was purporting to say was that his $12,000 annual salary was his sole motivation, and that his $38,900 original investment, . . . plus his loans to the corporation, plus his personal interest in the integrity of the corporation as a source of living for his son-in-law and as an investment for his son and his other son-in-law were of no consequence . . . .

We conclude on these facts that the taxpayer's explanation falls of its own weight, and that reasonable minds could not ascribe, on this record, a dominant motivation directed to the preservation of the taxpayer's salary as president of . . . [the corporation].

405 U.S. at 106–07, 92 S.Ct. at 834.

■ In determining whether advances made to one's wholly-owned corporation are loans or contributions to capital, we, too, believe that public policy and the prevention of fraud require that an "[i]ntention to create a debt . . . not be so readily proved", and that "[g]enerally it depends upon whether contemporaneous facts, not testimony given years later, establish an unconditional obligation to repay the advances." Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1124 (4th Cir. 1969). In that case, the court affirmed a determination of the Tax Court that advances made to taxpayer's wholly-owned corporation were contributions to capital even though the advances were shown as loans on the taxpayer's books and entered in the books of the receiving corporation as items payable in accordance with the bookeeping procedures for entry of debt approved in the state of incorporation.

This court, in Smith v. Commissioner, supra, has also held that in determining whether an advance to a closely-held corporation by the principal shareholders and officers is debt or equity, objective, contemporaneous criteria must be considered and accorded great weight. In that case, we affirmed a determination of the Tax Court that advances made by the taxpayer to his corporation were contributions to capital and that the unpaid balance of these advances could not be deducted as bad debts when the corporation became insolvent. In making this disposition, Judge Peck, writing for the court observed:

Inherent within the philosophy and structure of the income tax law is the proposition that all income is to be taxed unless it falls within a specific exemption, and if a taxpayer makes a deduction from income he must indicate the specific statutory authority for that deduction. [Citations omitted.]

It is equally well established that when such a deduction is claimed, the substance of the transaction, rather than its form, is controlling. [Citations omitted.]

In addition to indicating the specific law under which he claims a deduction, where as here a taxpayer is attempting to establish that an advance is a true loan and not a contribution to capital the burden of doing so is upon him. [Citations omitted.]

In determining whether the taxpayer has sustained the burden of establishing that a true loan and not a contribution to capital was intended when an advance has been made, a number of factors or tests must be taken into consideration. These include the presence or absence of a maturity date of the obligation, the name given to the writing (if any) evidencing the claimed obligation, the source of payments and repayments, the adequacy or inadequacy of capitalization, identity (or lack of identity) of interest between creditor and stockholder, the corporation's ability to obtain financing from independent lending institutions, and the timing of the advance with reference to the organization of the corporation. [Citations omitted.]

370 F.2d at 180.

We applied these criteria in Austin Village, Inc. v. United States, supra,

where we reversed a judgment for taxpayers entered by the district court which had held that advances made by shareholders to their closely-held corporation were loans, not contributions to capital. Although taxpayers testified that the advances were loans and although the transactions were evidenced by demand notes, this court held that any determination that the advances were genuine debts would be clearly erroneous. In explaining why this conclusion was required, the court stated:

> The maturity dates and interest rates assigned to the alleged loans were, at best, illusory, and in fact no interest payments or payments of principal had been made at the time this litigation commenced. Moreover, there was no *unconditional* promise to repay the loans, no fixed schedule of payments, no security and no sinking fund to provide funds for repayment. Also, it is significant that the putative loans were subordinated to the claims of all other creditors and were the result of the shareholders' inability to obtain sufficient conventional financing for the project.

> By way of contrast, the bank loans that eventually were obtained had the conventional indicia of debt and were repaid in due course.

432 F.2d at 745.

In applying the law to the facts of this case, we observe, as we did in the *Austin Village* case, that it is "clear that the objective factors . . . are decisive in cases of this type." 432 F.2d at 745. Only by requiring evidence contemporaneous with the advances that indicates that they were loans and not contributions to capital can courts minimize the danger that taxpayers will defer characterizing advances as loans or as contributions to capital until the tax consequences of such characterizations are certain.

■ In this case, the corporation did not unconditionally promise to repay the advances as required by Treas.Reg.

1.166–1(c). Instead, repayment appears to have been contingent upon the success of Ash Motors, Inc. Thus, Virginia Raymond testified that the advances "would be repaid at the time the Company could afford to do so out of the Company's *earned surplus* . . . ." (Emphasis added.) Under traditional accounting principles, interest expense is a factor in computing earned surplus and is not paid out of it. On the other hand, dividends, remuneration for capital investment, are paid from earned surplus. Moreover, the corporation did not issue notes payable to taxpayers, did not promise to repay the advances at a fixed interest rate or at a time certain, did not pay any principal or interest, gave no security for the advances, did not cause any interest to be accrued on its books, and did not establish a sinking fund for repayment. In addition, taxpayers, by acting as personal guarantors for secured loans made to the corporation by outsiders, subordinated their advances to the claims of their creditors. We consider also that taxpayers were the sole shareholders of the corporation and that the advances were made in starting the corporation which, it appears, was inadequately capitalized. The mere entry of the advances on the corporation's balance sheet as notes payable, taxpayers' self-serving testimony that the advances were loans, and the comment on two of the taxpayers' checks to the corporation that these checks were loans, are not sufficient to create a jury question whether the advances were loans. Moreover, we believe that the Resolution of the Board of Directors speaks for itself and cannot be interpreted as the taxpayers would have us do.

Accordingly, the district court did not err in directing a verdict for the government at the close of taxpayers' case—no reasonable person could have concluded on the basis of the record before us that the advances made by taxpayers to their corporation were loans and not contributions to capital.

Affirmed.