T.C. Memo. 2000-292


UNITED STATES TAX COURT


J. MICHAEL SHEDD AND MARITA SHEDD, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

J&J MANAGEMENT GROUP, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3209-99, 3210-99.        Filed September 18, 2000.


Marc A. Letvin, for petitioners.

Gary R. Shuler, Jr. and Matthew J. Fritz, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  These consolidated cases involve income tax deficiencies determined by respondent for petitioners' 1994 and 1995 taxable years.  Respondent determined income tax deficiencies and penalties for petitioners J. Michael and Marita Shedd, docket No. 3209-99, as follows:

| Year | Deficiency | Penalty Sec. 6662(a)[1] |
|------|-----------|--------------------------|
| 1994 | $26,835 | $5,367 |
| 1995 | 26,387 | 5,277 |

Respondent determined income tax deficiencies and penalties for petitioner J&J Management Group, Inc. (J&J), docket No. 3210-99, as follows:

| Year | Deficiency | Penalty Sec. 6662(a)[1] |
|------|-----------|--------------------------|
| 1994 | $3,402 | $680 |
| 1995 | 31,913 | 6,383 |

[1] Respondent has conceded that petitioners are not liable for sec. 6662(a) penalties for the 1994 or 1995 taxable year. Respondent concedes that the Shedds did not receive constructive dividends for 1994.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable periods under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issue for our consideration is whether advances from J&J to TLC Management, Inc. (TLC), were business loans or contributions to capital. If we decide that they were business loans, we must then decide whether J&J is entitled to a bad debt deduction under section 166. If we find that the advances were contributions to capital, we must then decide whether the advances should be treated as constructive dividends from J&J to the Shedds, in light of Mr. Shedd's ownership of stock in both J&J and TLC.

FINDINGS OF FACT

The parties' stipulation of facts and the exhibits are incorporated herein by this reference.

Petitioners J. Michael and Marita Shedd (the Shedds) are husband and wife and resided in Livonia, Michigan, at the time their petition was filed. The Shedds each owned 50 percent of J&J, whose principal place of business was Romulus, Michigan, at the time its petition was filed. J&J was engaged in the freight forwarding business in the Detroit, Michigan, metropolitan area. Mr. Shedd owned 100 percent of TLC, which was engaged in a freight forwarding business in Cleveland, Ohio. J&J and TLC are related due to Mr. Shedd's stock ownership. J&J began operating in June 1988, and Mrs. Shedd maintained its books without receiving compensation. Mr. Shedd was president of J&J. J&J did not declare or pay any dividends.

J&J was the first of the Shedds' companies to become involved in a network of independent freight forwarding contractors named SEKO. Payments were made by freight customers to SEKO, which retained 40 percent of adjusted revenues and remitted the balance to the contractors. SEKO also retained the right to apply customer receipts to outstanding indebtedness and was entitled to maintain contractor security deposits. Under its agreement with SEKO, J&J's shareholders were required to

personally guarantee performance of the contract and of all of J&J's financial obligations to SEKO.

J&J became indebted to SEKO in its first year of business. In May 1989, J&J executed a promissory note to SEKO for an amount in excess of $155,000. The borrowed funds were used to pay J&J's operating expenses. The promissory note reflected an unsecured loan without interest and with payments scheduled to end on June 1, 1993, or upon termination of the independent contractor agreement between J&J and SEKO. The payments were made from the periodic settlement of commissions owed by SEKO to J&J. SEKO would reduce the commission to J&J by an amount equal to 10 percent of the commission. Under this payment schedule, J&J paid its indebtedness to SEKO in approximately 1 year.

TLC was also incorporated in 1988 but did not begin operations until 1992 when it received its Ohio business certificate. Mr. Shedd was the president and treasurer, and Mrs. Shedd was secretary of TLC. TLC also contracted with SEKO and established a customer base due to the SEKO affiliation.

TLC was incorporated with $500 paid in capital, and no additional capital was contributed by the Shedds. Advances in the total amount of $119,700 were made by J&J to TLC from February 1992 through October 1995 for operating expenses evidenced by unsecured demand notes bearing 7-percent interest and signed by Mrs. Shedd, as TLC's secretary, as follows:

|                        | Amount of |                        |              |
| Dates of advances      | advances  | Date & amount of note  |              |
| 2/21/92 to 9/18/92     | $49,000   | 10/1/92                | $36,513.92   |
| 10/5/92 to 6/4/93      | 16,500    | 10/1/93                | 6,500.00     |
| 10/5/93 to 9/15/94     | 12,000    | 10/3/94                | 3,872.21     |
| 10/2/94 to 6/9/95      | 42,200    | 10/2/95                | 43,553.55    |
| Total                  | 119,700   |                        | 90,439.68    |

J&J did not require any personal guaranties from the Shedds on the advances to TLC. No repayment schedule was established, and J&J made no demand of TLC for payment of the principal or interest on the notes.

TLC was dissolved prior to April 1995, and it filed a "Notification of Dissolution or Surrender" with the State of Ohio Department of Taxation indicating that it ceased or would cease operations on April 1, 1995. On its 1995 Federal income tax return, TLC reported $90,440 income due from the forgiveness of the above-described debt. J&J claimed the amount as a bad debt deduction and respondent disallowed the deduction.

## OPINION

Respondent contends that J&J's advances to TLC, a corporation wholly owned by J&J's shareholders, constituted equity investments in those companies. As such, TLC's subsequent failure resulted in capital as opposed to ordinary losses for J&J. Respondent also contends that the funds advanced to TLC by J&J were constructive dividends. Petitioners counter that the advances constituted valid debt between J&J and TLC and that TLC's inability to repay the debt resulted in worthlessness and

entitled J&J to an ordinary loss deduction under section 166. Because of petitioners' characterization of the advances as bona fide loans, they contend that the advancing of funds was not a constructive dividend.

Bad Debt

Bad debts which become worthless within the taxable year are deductible by a corporate taxpayer as ordinary losses under section 166(a)(1).  The right to a deduction is limited to genuine debt, and capital contributions are not considered debt for the purposes of section 166(a)(1).  See Raymond v. United States, 511 F.2d 185, 189 (6th Cir. 1975).  Capital contributions, on the other hand, may result in a capital loss for a shareholder if the stock becomes worthless.  See sec. 165(g)(1).

The determination of whether advances to a corporation are loans or capital contributions depends on whether there is an intention to create an unconditional obligation to repay the advances.  See Raymond v. Commissioner, supra at 190.  Advances between related corporations are subject to particular scrutiny because the relationship more readily facilitates fictionalized debt.  See In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976).  Petitioners must show that the advances were loans rather than capital contributions as determined by respondent.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

In order to show entitlement to an ordinary loss under section 166, petitioners must establish that (1) a bona fide debt existed between J&J and TLC which obligated TLC to pay J&J a fixed or determinable sum of money, (2) the debt was created or acquired in connection with a trade or business of J&J, and (3) the debt became worthless when claimed. See United States v. Generes, 405 U.S. 93 (1972); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 285 (1990); Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Black v. Commissioner, 52 T.C. 147, 151 (1969). A gift or contribution to capital is not debt within the meaning of section 166. See Calumet Indus., Inc. v. Commissioner, supra at 284; Kean v. Commissioner, 91 T.C. 575, 594 (1988).

Accordingly, petitioners must show that there was "a genuine intention to create a debt, with a reasonable expectation of repayment" and that the intention was consistent with the "economic reality of creating a debtor-creditor relationship". Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). Whether the requisite intention to create a true debtor-creditor relationship existed is a question of fact to be determined from a review of all the evidence. See id. Factors that have been considered in the analysis of this issue include (1) the names given to the certificates evidencing the indebtedness, (2) the presence or absence of a fixed maturity date, (3) the source of

payments, (4) the right to enforce payments, (5) participation in management as a result of the advances, (6) the status of the advances in relation to regular corporate creditors, (7) the ratio of debt to capital of the corporation, (8) the ability of the corporation to obtain credit from outside sources, (9) the use to which the advances were put, (10) the failure of the debtor to repay, and (11) the risk involved in making the advances.  See Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir. 1986); Calumet Indus., Inc. v. Commissioner, supra; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  No single factor is determinative, and not all factors are applicable in each case.  See Dixie Dairies Corp. v. Commissioner, supra.  "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship."  Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).

We consider each of the suggested factors in our analysis of whether petitioners created bona fide debt rather than equity, as determined by respondent.

1.  Name Given Instruments Evidencing Indebtedness

The issuance of a note may be indicative of bona fide debt.
See Estate of Mixon v. Commissioner, 464 F.2d 394, 402 (5th Cir.

1972).  The existence of a note, however, is not in and of itself conclusive.  An unsecured note, with no payments made thereon, weighs towards equity.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951).

Here, notes were signed, but they were not signed until the end of the fiscal year in which funds had been advanced. Further, the notes were executed in amounts that were less than the amount that had been advanced.  Furthermore, the evidence shows that no payments were ever made on these unsecured advances.  When a transaction involves a closely held corporation, the forms and labels assigned to a transaction may mean little due to the parties' ability to mold the transaction to their will.  See Anchor Natl. Life Ins. Co. v. Commissioner, 93 T.C. 382, 407 (1989).  For these reasons, we find that the notes have only limited probative value in our evaluation of whether the advances were bona fide indebtedness.

## 2.  Presence or Absence of Fixed Maturity Date and Schedule of Payments

Here, no schedule of payments or due date was established. Petitioners' claim that demand notes weigh in their favor, but

that argument was of little import because no demand for payment was made.

## 3. Source of Repayments

If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.  See In re Lane 742 F.2d 1311, 1314 (11th Cir. 1984); Estate of Mixon v. Commissioner, supra at 405.  An expectation of repayment solely from corporate earnings is not indicative of a bona fide debt.  See In re Lane, supra at 1314.  There has been no showing of any other source of repayment other than the TLC's business receipts.

## 4. The Right To Enforce Payments

A definite obligation to repay principal and interest favors the existence of debt.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639.  Repayment that is within the discretion of the parties and conditioned upon the occurrence of certain events is more like equity.  See id.  Even where there is a basic right to enforce payment, failure to take customary steps to ensure payment--such as securing the advance or establishing a sinking fund--may indicate an equity rather than debt relationship.  See In re Lane, supra at 1317.

J&J made no attempt to demand payment from TLC.  Further, J&J did not require security or a sinking fund.  TLC had no obligation to repay on a fixed schedule or by a certain date.

The evidence does not support petitioners' claim that they expected to be repaid.

## 5.  Participation in Management as a Result of the Advances

Normally, acquisition of management responsibilities by the party advancing funds is more likely to be evidence of an equity relationship.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639.  Here, however, Mr. Shedd was already the managing shareholder of J&J and TLC, and so this factor is neutralized in this case.

## 6.  The Status of the Advances in Relation to Regular Corporate Creditors

Subordination of advances to claims of other creditors indicates that the advances were capital contributions and not loans.  See id.  There is insufficient evidence to judge the weight of this factor.

## 7.  The Ratio of Debt to Capital of the Corporation

Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639; Estate of Mixon v. Commissioner, supra at 408.  Here, Mr. Shedd testified that TLC received $500 of initial capitalization and no further contributions were received from the Shedds.  Comparing capital of $500 with over $90,000 in advances, it appears that the advances were more likely capital in nature.

## 8. The Ability of the Corporation To Obtain Credit From Outside Sources

If a party receiving an advance can borrow funds from another lender in an arm's-length transaction on similar terms, the advance may appear to be debt. See Electronic Modules Corp. v. United States, 695 F.2d 1367, 1370 (Fed. Cir. 1982); Estate of Mixon v. Commissioner, supra at 410. This factor is strongest for petitioners. At trial, the chief financial officer of SEKO testified that SEKO would have made the loans to TLC, up to the $90,000 that was actually advanced. He spoke of the industry norm of thin capitalization and of the practice of advancing funds to companies losing money for a certain period of time. Though the independent contractor agreement addresses guaranties, he testified that no personal guaranties were required on the notes to the contractors.

If J&J had advanced the funds in the exact same manner that SEKO advanced funds to its independent contractors, this factor would have had more probative value in petitioners' favor. In its loan agreement, SEKO arranges to withhold 10 percent of any commission payment due to the independent contractor. By doing so, the independent contractor is not given a choice of which creditor to pay. The note also establishes a termination date by which time the note must be paid. These two important factors

are not present in the advances to TLC and do not support an intention by J&J to collect on the advances.

## 9.  The Use to Which the Advances Were Put

Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 640; Raymond v. United States, 511 F.2d at 191; Estate of Mixon v. Commissioner, 464 F.2d at 410.  The advanced funds were used to pay the operating expenses of TLC.  Accordingly, this factor favors petitioners' position.

## 10.  The Failure of the Debtor To Repay

The absence of payments of principal or interest is a strong indication that the advances were capital contributions rather than loans.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 640; Raymond v. Commissioner, supra at 191; Austin Village, Inc. v. United States, 432 F.2d 741, 745 (1970).  It is undisputed that TLC never made a payment over the 4-year period when it received funds from J&J, nor did J&J make any demand for payment.  Accordingly, it appears that J&J never intended to compel repayment of the advances.

## 11.  The Risk Involved in Making The Advances

The absence of security for the advances indicates that the advances were more likely capital contributions.  See In re Lane,

742 F.2d at 1317; Raymond v. United States, supra at 191; Austin Village, Inc. v. Commissioner, supra at 745.  J&J did not require security from TLC.

Having weighed all the factors, we hold that J&J's advances were capital contributions and not bona fide loans. The fact that SEKO would have been willing to lend to TLC weighed in favor of bona fide indebtedness, but the differences in the terms and the ability of SEKO to collect directly from the receipts of its borrowers stripped away much of the weight.

Having decided the advances were contributions to capital, we must now decide whether those contributions should be treated as constructive dividends to the Shedds.

Constructive Dividend to Common Shareholder

Generally, distributions of property of a corporation to a shareholder, with respect to the shareholder's stock, out of its earnings and profits are taxable to the shareholder as dividend income to the extent of the availability of corporate earnings and profits.  See secs. 61(a)(7), 301(a), 301(c), 316(a).  Here we consider whether the advances to TLC were constructive dividend to the Shedds, even though there was no formal dividend declaration.  See Wilkof v. Commissioner, T.C. Memo. 1978-496, affd. 636 F.2d 1139 (6th Cir. 1981).  A transfer of property between related corporations may constitute a dividend to common

shareholders even though no funds or property are directly received by them.

Two tests are normally employed to decide whether a transfer between related corporations constitutes a constructive dividend. One is an objective distribution test and the other a subjective test of primary purpose, both of which must be satisfied. See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 641.

First, there must be a distribution from the transferring corporation's earnings and profits; i.e., the transferee corporation must receive something at the expense of the transferor. This test requires property to leave the control of the transferor corporation in a way that allows a common shareholder to directly or indirectly control the property through some other instrumentality. Where property is transferred between related corporations, a common shareholder does not personally receive the property. Therefore, a distribution is thought to occur when a transferee corporation attains an increase in assets or control at the expense of a transferor corporation. The amount of such distribution is measured by the loss to the transferring corporation. See Sammons v. Commissioner, 472 F.2d 449, 451, 453 (5th Cir. 1972), affg. in part, revg. in part and remanding on other grounds T.C. Memo. 1971-145; Stinnett's Pontiac Serv., Inc. v. Commissioner,

supra; <u>Sparks Nugget, Inc. v. Commissioner</u>, T.C. Memo. 1970-74, affd. 458 F.2d 631 (9th Cir. 1972).

Here, J&J made a capital contribution rather than a loan to TLC. When petitioner J&J advanced the funds to TLC, Mr. Shedd, as president and sole shareholder of TLC, then had indirect control over those funds. The advance by J&J to TLC is sufficient to meet the objective test.

The second test is designed to differentiate between normal business transactions of related corporations and those designed primarily to benefit a common shareholder. The primary or dominant motivation for a distribution must be examined. See <u>Sammons v. Commissioner</u>, <u>supra</u> at 451-452. The Shedds must show a legitimate corporate or business justification which is the primary cause for the advance and which is sufficient to overcome the conclusion that Mr. Shedd, as the shareholder, primarily benefited from the advance of funds. A legitimate corporate justification is demonstrated by showing that the distribution would be in the best interest of the transferring corporation. If justifiable business reasons exist that account for the transfer, such reasons will suffice to override any incidental or derivative benefit to a common shareholder. See <u>Wilkof v. Commissioner</u>, <u>supra</u>. However, where a corporation's distribution serves no legitimate corporate purpose, it must be treated as a constructive dividend to the benefited shareholder. See

Commissioner v. Riss, 374 F.2d 161, 167 (8th Cir. 1967), affg. in part, revg. in part and remanding on another ground T.C. Memo. 1964-190.

Mr. Shedd testified that J&J lent the money to TLC in order to create a business with which it could share costs of forwarding freight. While this would be a valid business purpose, the Shedds have presented no documentary or corroborating evidence of any savings over the 4-year period funds were advanced. In this regard, petitioners contend that requiring corroborating documentary evidence of the savings effectively increases the level of their burden of proof from a preponderance to "beyond a reasonable doubt". Petitioners have confused the level of their burden with the need to provide particulars or details of the savings. Petitioners have merely made the uncorroborated statement that there either could have been or were savings. They have not, however, explained how those savings would or did occur. Petitioners have not presented sufficient documentary evidence or testimony explaining the business purpose for the advances. It has not been shown that the Shedds were acting in J&J's business interests when funds were advanced to TLC. Instead, it appears that Mr. Shedd was acting in his own best interests as sole shareholder of TLC when he caused the injection of additional capital into TLC, an

inadequately capitalized entity.  Accordingly, we hold that petitioners Shedd realized a constructive dividend.

To address concessions of the parties and to reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>