T.C. Memo. 2001-220


UNITED STATES TAX COURT


BRAZORIA COUNTY STEWART FOOD MARKETS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1037-99.                    Filed August 14, 2001.


<u>George W. Connelly, Jr.,</u> and <u>William O. Grimsinger</u>, for
petitioner.

<u>Richard T. Cummings</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GERBER, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax for its fiscal tax years ended
September 30, 1991, 1992, and 1994, of $216,552, $225,336, and
$8,190, respectively.  The sole issue for our consideration is
whether bad-debt deductions taken in 1994 are allowable under

section 166.[1]  The remainder of respondent's deficiency
determinations resulted purely from computational adjustments
caused by the disallowance of petitioner's ordinary loss
deduction.

Petitioner contends that, in form and substance, the
advances were loans that became worthless and deductible.
Respondent's disallowance of the claimed bad-debt loss was
grounded on the same position that respondent maintains in this
litigation; i.e., petitioner's advances to a related corporation,
Used Power Equipment, Inc. (UPE), were equity investments in UPE
and there was no intention for UPE to repay the advances.  In
support of his position, respondent questions the validity,
credibility, and enforceability of petitioner's promissory notes
and contends UPE was insolvent at the time the advances were
made.  Respondent ultimately contends that the advances were
contributions to capital made to further petitioner's sole
shareholder's control of and investment in UPE, the loss of which
is a capital loss deductible only to the extent of capital gains
under section 1211.

---

[1] Unless otherwise stated, all section references are to the
Internal Revenue Code in effect for the taxable year remaining in
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

## FINDINGS OF FACT[2]

Petitioner, Brazoria County Stewart Food Markets, Inc., was incorporated in Texas on March 27, 1981.  Petitioner's place of business at the time the petition was filed was Brazoria, Texas. Petitioner, a subchapter C corporation, operates grocery stores. Vernon Stewart (Stewart) is petitioner's chief executive officer and sole shareholder.  Stewart founded petitioner as a sole proprietorship in 1975, after his purchase of a small grocery store.  The first grocery store was successful, and within a year two additional small grocery stores were acquired.  After a loss of business due to competition, the first store was closed. Petitioner operated as many as five small grocery stores at one time.  Ultimately, only the two most profitable stores were expanded into supermarkets and survived.

Grocers Supply Co. (Grocers), a large wholesale distributor of grocery products to independent grocery stores in and around Houston, Texas, was petitioner's primary supplier of grocery products.  In addition to its business as a distributor of grocery products, Grocers frequently made loans to its customers for working capital, store renovation, expansion, and other purposes.  Grocers' loans were made at competitive rates and were normally secured by the borrower's inventory, furniture,

---

[2] The parties' stipulation of facts and exhibits is incorporated herein by this reference.

fixtures, receivables, and other assets. Grocers was owned by Max and Milton Levit, and its chief financial officer was James Nelson (Nelson). Petitioner's and UPE's loan requests of Grocers and loan renegotiations were subject to the approval of Milton Levit. When a loan request was approved, Nelson became responsible for its management and collection. It was Grocers' policy not to become involved in the operation of retail stores or to become an equity investor or stockholder. If a borrower defaulted without satisfactory means of repayment, Grocers enforced its security interest by taking possession of the secured assets and liquidating them. Some of petitioner's early stores were purchased from and/or with financial assistance from Grocers. Petitioner acquired small stores from Grocers and/or its debtors after the debtors' default on their obligations to Grocers.

Once petitioner was firmly established in the supermarket business, Stewart used petitioner's capital to diversify into the purchase and sale of used industrial equipment. Stewart incorporated UPE in Texas during 1987 to sell salvaged equipment that had been removed from industrial plants. Most of UPE's salvaged materials consisted of powerhouse and ethylene plant equipment. A substantial portion of UPE's operating expenses was due to the cost of labor, cleanup, and storage for equipment.

Initially, UPE had three stockholders, Stewart, Kelso Vernor (Vernor), and Joseph Busch (Busch). Their collective initial capital contribution to UPE was $1,000, with each of the three shareholders receiving one-third of the common stock. Mickey Goolsby (Goolsby) was hired as UPE's president to run the day-to-day operations.

Vernor was a demolition expert, and before UPE's incorporation, he had been awarded a salvage contract by Dow Chemical Co. (Dow). Vernor contributed the Dow contract to UPE. Under the contract, Dow agreed to exchange equipment and its accompanying paperwork and support parts for UPE's removal of the equipment from Dow's premises. The Dow contract provided UPE with an inventory of used equipment. Busch, who was familiar with the salvaged equipment, was responsible for cataloging the parts and machinery. In addition, Busch had a working knowledge of the international markets for used equipment, and he was to seek the highest price for UPE's salvaged equipment.

Stewart was responsible for securing capital for UPE. As petitioner's sole shareholder, Stewart directed petitioner to make a number of advances of working capital to UPE. Some of the advances came from petitioner's operating capital, but most advances were from the proceeds of petitioner's loans from Grocers. Stewart personally guaranteed the only loan that UPE had made directly with Grocers.

On October 1, 1987, petitioner made two advances for operating capital to UPE in the amounts of $100,000 and $80,622, respectively. The advances from petitioner to UPE were not contemporaneously memorialized in promissory notes.

During 1987, 1988, and 1989, UPE obtained several salvage jobs, sold some of its inventory, and brokered a deal that netted $450,000 in commission fees; however, UPE reported losses for those tax years. Stewart, however, desired to expand UPE's operation beyond salvage and used equipment sales, and in 1990, UPE entered into a short-term industrial construction venture with Formosa Plastics Corp. U.S.A. (Formosa).

After a feasibility study, it was determined that the Formosa venture could be profitable because UPE's labor force already had the necessary skills for performance. UPE bid on and was awarded six contracts (the Formosa contracts) valued at $8,430,963. UPE did not seek legal counsel at the time the contracts were executed, and the terms of the contracts were unfavorable to UPE and favorable to Formosa. UPE expected a profit of at least 10 percent from the Formosa contracts.

Under the Formosa contracts, UPE was required to supply the labor, tools, and equipment necessary for the installation of piping and turbines. Formosa was to supply the pipe and the turbines and make progress payments at various stages of completion. UPE planned to use the progress payments to pay for

the costs of completion, but UPE did not have sufficient capital to finance the initial costs of labor and equipment.

Under Stewart's direction, petitioner requested and received three separate loans from Grocers and, in turn, petitioner advanced the proceeds to UPE. Grocers made each of its loans to petitioner with the knowledge that UPE would receive the proceeds. The loans were structured this way because of Grocers' concerns about collateral and UPE's ongoing ability to service the indebtedness. Petitioner did not attempt to obtain any of its loans from a source other than Grocers. In addition to the advances from petitioner, UPE obtained its own separate loan from Grocers. UPE did not attempt to obtain its loan from any source other than Grocers.

On March 7, 1990, the first loan, in the amount of $250,000, was extended from Grocers to petitioner and was secured by petitioner's inventory, cash, checks, and receivables. The loan was designated for UPE's use as working capital. The proceeds, in turn, were advanced to UPE without promissory notes from UPE to petitioner. On August 30, 1990, UPE paid off the balance of the $250,000 loan from Grocers.

Stewart was optimistic about UPE's future, and he believed that the Formosa job would be a quick fix to UPE's cashflow problems. UPE's recurring losses and related problems caused Vernor and Busch to disagree with Stewart, and they were not

prepared to go along with UPE's new venture. On April 30, 1990, Stewart arranged for a second loan from Grocers to petitioner in the amount of $475,000. The loan proceeds were, in turn, advanced to UPE and/or used in connection with UPE as follows: $300,000 for UPE's working capital; $100,000 for the purchase of UPE's equipment; and $75,000 to buy out Vernor's and Busch's interests and shares in UPE. Petitioner's loan from Grocers was secured by petitioner's inventory, cash, checks, and receivables. The proceeds were advanced to UPE without a note.

In May of 1990, Vernor's and Busch's UPE shares were redeemed with $75,000 from petitioner's $475,000 loan from Grocers. After the other two shareholders were bought out, Stewart named himself president and demoted Goolsby from president to vice president.

After Stewart gained control of UPE, he negotiated a loan from Grocers. Although it was not Grocers' normal business practice to lend money to entities outside of the grocery industry, UPE requested and received a loan in the amount of $218,000 on September 5, 1990. That loan was designated for the purchase of construction equipment, and Grocers received a security interest in UPE's equipment. A $111,984.67 balance remaining on UPE's loan from Grocers was eventually satisfied by petitioner when UPE and Stewart could no longer afford to repay the debt.

As the Formosa construction progressed, it became clear that UPE's expenses were higher than Stewart had anticipated, and UPE's performance under the contracts required an additional infusion of capital.  On October 11, 1990, Stewart negotiated a third loan from Grocers to petitioner in the amount of $300,000.  That loan, which was in turn advanced to UPE, was designated for use as UPE's working capital but secured by petitioner's fixtures, equipment, machinery, furniture, inventory, cash, and receivables.

The three loans from Grocers to petitioner, and the loan from Grocers to UPE, were personally guaranteed by Stewart and bore interest at 10 percent.

Petitioner's certified public accountants, Everett Enoch Kennemer III (Kennemer) and Marylin C. Anderson of the accounting firm Kennemer, Masters, Koester & Wallace, L.L.C., advised petitioner in its tax matters and also prepared financial compilations weekly and sometimes quarterly.  Kennemer was intimately familiar with petitioner's business.  In addition to advising petitioner, Kennemer's firm also provided accounting services for UPE.

Petitioner did not notify its accountant about the advances; and although petitioner is an accrual method taxpayer, there was no interest increase on petitioner's books allocable to the UPE advances.  No interest income from the advances was reflected on

petitioner's Federal income tax returns for the years in issue. No interest expenses from the advances were reflected on UPE's Federal income tax returns.

Although UPE received progress payments from Formosa totaling $7,778,963, it could not complete any of the construction projects. Rain delays, equipment supply problems, and change orders slowed UPE's progress. In April 1992, Formosa gave UPE written notice of intent to terminate the contracts. UPE ceased operations, and on April 24, 1992, UPE brought suit against Formosa in the U.S. District Court for the Southern District of Texas, Victoria Division, Civil Action No. V-92-16.

In its lawsuit against Formosa, UPE claimed $2,082,000 in damages, alleging that Formosa failed to pay amounts due on contracts and that UPE had suffered damages from Formosa's delays and hindrance. In settlement, UPE and Formosa entered into a formal agreement under which Formosa agreed to pay UPE $700,000 in full satisfaction of all claims. In 1994, UPE received a net recovery of $227,113.97. After the settlement, UPE ceased operations and sold its inventory of used equipment for scrap metal.

On its 1994 Form 1120, U.S. Corporation Income Tax Return, petitioner claimed the outstanding advances to UPE as a bad-debt deduction. Attached to petitioner's 1994 tax return was a Form 8275, Disclosure Statement, on which petitioner claimed that

$1,352,433 of unrecoverable debt was attributable to its advances to UPE.  Included within petitioner's claimed deduction was the amount of $111,984.67, which represented the balance on UPE's loan from Grocers that petitioner had paid off.  The deduction was the basis for a claimed net operating loss that was carried back to petitioner's 1991 and 1992 tax years.

## OPINION

The sole issue we consider is whether petitioner is entitled to a business bad debt deduction for its 1994 tax year.[3]  Bad debts that become worthless within the taxable year are deductible by a corporate taxpayer as ordinary losses under section 166(a).  The right to a deduction is limited to genuine debt, and specifically, contributions to capital are not considered debt for the purposes of section 166(a)(1).  See Raymond v. United States, 511 F.2d 185, 189 (6th Cir. 1975); sec. 1.166-1(c), Income Tax Regs.  Before a bad debt deduction may be taken under section 166(a), a taxpayer must establish the

---

[3] At trial, near the conclusion of petitioner's case-in-chief, petitioner's counsel stated that petitioner would not be relying on the alternative theory that petitioner was entitled to interest expense deductions under sec. 163.  As a result, respondent limited his cross-examination of at least one of petitioner's witnesses and rested without offering any witnesses of his own.  Thereafter, petitioner resurrected and argued the sec. 163 issue on brief in spite of its concession at trial.  Such behavior is impermissible and prejudicial to respondent.  Accordingly, petitioner is precluded from urging its alternative theory under sec. 163.  See Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985).

validity of the debt and show that the advances were loans rather than capital contributions. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). We consider here whether petitioner's advances to UPE created bona fide indebtedness or whether petitioner's advances were contributions to capital representative of an equity stake in UPE.

The determination of whether advances to a corporation have created bona fide indebtedness depends on whether there is an intention to create an unconditional obligation to repay the advances. See Raymond v. United States, supra at 190. Because bad debt deductions affect ordinary income and equity losses affect capital gain income, there appears to be a preference for bad debt deductions. There has been much litigation on this subject, and the courts consider various factors when deciding whether advances are debt or equity. The Court of Appeals for the Fifth Circuit, to which this case is appealable, considers at least 13 nonexclusive factors principally relevant in determining whether advances to a corporation have created debt or equity. See Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).[4]

---

[4] The Estate of Mixon factors include: (1) The names given to the certificates evidencing the indebtedness; (2) whether there is a fixed maturity date; (3) the source of the payments; (4) whether repayment is legally enforceable; (5) whether the creditor may participate in the debtor's management; (6) whether the obligation is subordinate to other debts; (7) the intent of
(continued...)

While <u>Estate of Mixon</u> provides a framework for analysis, great flexibility in its application is permitted.  The factors are not of equal importance, and no single factor is controlling. See <u>Dillin v. United States</u>, 433 F.2d 1097, 1100 (5th Cir. 1970). The object of the inquiry is not to count factors, but to evaluate them.[5]  <u>Tyler v. Tomlinson</u>, 414 F.2d 844, 848 (5th Cir. 1969).  The facts and circumstances of each case must be considered, and no single factor is considered determinative. See <u>John Kelly Co. v. Commissioner</u>, 326 U.S. 521, 530 (1946); <u>Segel v. Commissioner</u>, 89 T.C. 816, 827 (1987).  "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship."  <u>Fin Hay Realty Co. v. United States</u>, 398 F.2d 694, 697 (3d Cir. 1968).

---

[4](...continued)
the parties; (8) the debtor's capitalization and use of the funds; (9) the identity of interest between creditor and stockholder; (10) whether interest was paid; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.  See <u>Estate of Mixon v. United States</u>, 464 F.2d 394, 402 (5th Cir. 1972).

[5] In this case we have considered all of the factors set forth in <u>Estate of Mixon</u>.  Only certain of the factors, however, are germane to the factual scenario presented in the record.  We, accordingly, analyze those factors that are significant to the evaluation of whether petitioner's advances were debt or equity.

Ultimately, the issue for our consideration is whether petitioner and UPE intended to create indebtedness with a reasonable expectation of repayment and whether those aspects comported with economic reality. See Estate of Mixon v. United States, supra at 407. Generally, shareholders place their money at the risk of the business while lenders seek a more reliable return. See Midland Distribs., Inc. v. United States, 481 F.2d 730, 733 (5th Cir. 1973). In the setting of this case, it appears that petitioner either advanced capital to UPE at Stewart's direction and/or that petitioner was a conduit for UPE's loans from Grocers. UPE did not have sufficient capital assets to satisfy the security requirements of Grocers. In that regard, Grocers was a true lender, and it sought to profit from interest income and required security to protect its loan principal. Petitioner's actions here do not reflect an intent to lend for profit. Petitioner's advances to UPE exposed it to the risks of UPE's business. In essence, petitioner was Stewart's instrumentality for equity investment in UPE.

Petitioner contends that its advances to UPE were commercially reasonable arm's-length transactions. However, petitioner has failed to support this contention. In an arm's-length debtor-creditor relationship, a creditor expects to be repaid whether the debtor does well or poorly at his business. If the debtor does poorly, the creditor expects to be repaid from

capital. Where there is no capital, the creditor is exposed to the risks of a shareholder, not a lender. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 288 (1990).

Grocers' loans to petitioner were secured by petitioner's assets, whereas petitioner's advances were exposed to the risks of UPE's business. We find it significant that petitioner's and UPE's financial records did not show the advances as loans or debt. In that regard, petitioner is an accrual method taxpayer, but no interest was reflected on petitioner's books or Federal income tax returns with respect to the advances to UPE. Petitioner's accountants/return preparers testified that it would have been appropriate to report interest income. The accountants, however, were unaware of petitioner's advances to UPE. Similarly, no interest expenses from the advances were reflected on UPE's Federal income tax returns. When a corporate contributor does not seek or pursue interest on its contribution, its gain, if any, would more likely be from a share of profits and/or increase in the value of its shareholdings. See Estate of Mixon v. United States, supra at 409.

In the same manner as petitioner's and UPE's failure to book the advances, the habitual postponement of UPE's obligation to repay is telling. That is especially so here, where UPE had ample opportunity to repay petitioner from progress payments received from Formosa. We note that approximately 93 percent of

the total amount expected was received from Formosa whereas the repayments of many of petitioner's advances were postponed for 3 or more years, and some were never repaid. Postponement of this magnitude overtly suggests that petitioner's advances were purposefully and systematically subordinated in favor of those of other creditors, including Grocers, in an effort to keep petitioner's and Stewart's investment in UPE viable.

Here, petitioner was wholly owned by Stewart, who eventually used petitioner's resources to acquire 100 percent of UPE. A portion of the advances UPE received from petitioner was used to buy out the other owners of UPE common stock, making Stewart the sole shareholder of both petitioner and UPE. Upon gaining control of UPE, Stewart made himself president and demoted Goolsby to vice president.

Another factor weighing heavily against petitioner is the fact that UPE was thinly capitalized ($1,000) and reported losses at the time of all advances. To counter this factor, petitioner argues that UPE's inventory was worth more than $100 million at the time of the advances. Both Stewart and Goolsby testified that UPE's inventory was probably worth millions of dollars, but that value depended upon the ability to tap the international market. They also pointed out that UPE did not reflect the equipment's fair market value on its books because of a lack of basis. In light of the record, we find their testimony to be

self-serving and unconvincing. There was no appraisal of UPE's inventory. The witnesses estimated the value on the basis, in great part, of a one-time brokered sale of two turbines for $14,500,000 in which UPE received a $450,000 fee. Petitioner has not shown that its inventory was similar to the example used by the witnesses. There is little in the record to show exactly the type of equipment in UPE's inventory and/or that the equipment was in good working order.

Significantly, UPE's inventory was sold locally, only a few years later, for scrap. Grocers made one loan directly to UPE with its equipment as security. All other loans from Grocers went through petitioner. It is likely that Grocers would not lend more directly to UPE because of UPE's lack of capital for security. The value of UPE's inventory was, therefore, insufficient to provide security for a loan or improve UPE's financial picture at the time of the advances. Accordingly, even if the inventory had been pledged by UPE as security for petitioner's advances, it would have been insufficient to provide the security that a creditor would require.

Without petitioner's advances, UPE would have been unable to continue the salvage operations, purchase equipment, or perform under the Formosa contracts. UPE reported a loss during every year of its existence. Even after it began receiving progress payments from Formosa, UPE needed large infusions of capital

simply to maintain its construction operations.  Petitioner contends that the advances were not used to acquire capital assets; however, before its venture into the construction business, UPE did not possess the equipment that it needed to perform its construction obligations under the Formosa contracts. UPE, at its inception, used some of petitioner's advances to acquire capital assets at the startup of UPE.  See Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 722 (5th Cir. 1972), affg. T.C. Memo. 1970-182.  "Providing the bulk of the necessary first assets without which a corporation could not begin functioning is as traditional a usage of capital contributions as is purchasing 'capital assets'."  Slappey Drive Indus. Park v. United States, 561 F.2d 572 (5th Cir. 1977).

In an attempt to show that the advances were bona fide indebtedness, petitioner, at trial, offered 24 separate promissory notes reflecting interest and maturity dates.  The promissory notes petitioner relied on were prepared for purposes of trial in an attempt to show the type of notes that were allegedly executed at the time of the advances.  Stewart testified that original notes were prepared at the time of the advances, but that, alternatively they were lost, or could not be located or may have been destroyed in a 1991 UPE office fire. Although he signed all 24 of the reconstructed notes offered at trial, Stewart could not remember the circumstances under which

the alleged original notes were created or identify the person who created them. Stewart also testified that at least two of the original notes had a 12-percent rate of interest. In that regard, the reconstructed notes reflected 10 percent interest. On this record, it would be difficult to find that notes were executed at the time that petitioner advanced funds to UPE. Considering the failure to advise the accountants of the advances, failure to book interest income, and failure to book the advances as loans, it is unlikely that petitioner went through the formality of notes at the time the funds were advanced to UPE. Even if we were able to find that such notes contemporaneously existed, the substance of the financial transactions, on this record, reflects that the advances were equity and not loans.

Another important fact is that the alleged promissory notes from UPE to petitioner were not secured by its tangible assets or guaranteed by its shareholders. Petitioner contends that the alleged notes were secured by UPE's rights to payment under the Formosa contracts. Accordingly, the possibility of "repayment" would have depended solely upon UPE's receipts from the Formosa contracts and then only to the extent that creditors were paid off and/or UPE had profits from which to repay petitioner. At the time of the advances, the work on the Formosa contracts had not yet been performed, and Formosa's payments to UPE were

contingent on UPE's progress.  Regarding the actual contracts, UPE's attorney wrote the following in a letter to petitioner's accountant:  "At the time the [Formosa] contracts were entered, UPE did not seek legal counsel and the contracts were very onerous to UPE and favorable to Formosa."  When testifying about which of the Formosa contracts secured the alleged promissory notes, Stewart could not identify any of them.

As shown by their actions, the parties intended the funds advanced to be an investment in UPE.  For these reasons, we find that petitioner made an equity investment in UPE and, therefore, when UPE failed to repay, petitioner suffered a capital loss. See Kean v. Commissioner, 91 T.C. 575, 594-600 (1988).

We have considered all other arguments advanced by the parties, and to the extent that we have not addressed these arguments, we consider them irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered for respondent.